R. J. BROWN, SHERIFF, v. W. L. KING.

Decided February 10, 1906.

**1.—Liability of Sheriff for Acts of Deputy.**

In order to impose responsibility upon a sheriff for the act of his deputy it must appear that the act of which complaint is made was done by the deputy while in the execution of some writ or process lawfully issued, or while in the performance of some duty imposed by law upon the sheriff or the acting deputy. Facts considered, and held not to show liability of sheriff for acts of his deputies in attempting to make an arrest for disturbing the peace and carrying a pistol.

**2.—"Color of Office"—Definition.**

By the phrase "color of office" is meant a claim or assumption of right to do an act by virtue of an office, made by a person who is legally destitute of such right.

**3.—Arrest Without Warrant—When Lawful.**

While certain provisions of our penal law permit and require a peace officer to arrest a citizen without warrant, still the specified conditions under which this may be done must be made distinctly to appear to justify the officer and to render his acts official.

**4.—Unlawful Act of Deputy—Ratification Doubtful.**

It is doubtful whether a recovery could be had against a sheriff on the ground of a ratification by him of the unlawful acts of his deputy.

Appeal from the District Court of Clay County. Tried below before Hon. A. H. Carrigan.

*Freeman & Batsell* and *Wolfe, Hare & Maxey,* for appellant, cited:—

Const. of Texas, art. 1, sec. 9; Shields v. State, 16 So. Rep., 87; on guaranty against unreasonable seizure and searches.

A sheriff is responsible only for the official acts of his deputy: Rev. Stats., art. 4897; Maddox v. Hudgeons, 72 S. W. Rep., 414; Hamilton v. Ward, 4 Texas, 356; Haley v. Greenwood, 28 Texas, 680; Thomas v. Browder, 33 Texas, 784; Heidenheimer v. Brent, 59 Texas, 533; Holliman v. Carroll, 27 Texas, 23; Morris v. Kasling, 79 Texas, 148; Cortez v. State, 69 S. W. Rep., 536; Montgomery v. State, 65 S. W. Rep., 540; Russell v. State, 37 Texas Crim. Rep., 317; Lacy v. State, 7 Texas Crim. App., 413; Alford v. State, 8 Texas Crim App., 561; Pickett v. State, 25 S. E. Rep., 609; Williams v. State, 28 S. E. Rep., 629; Grumon v. Raymond, 6 Am. Dec., 203; Barnes v. Whitaker, 45 Wis., 204; State v. Wade, 40 Atlan. Rep., 104; Garber v. Arkley, 37 Wis., 43; McLendon v. Kennerdy (Tenn.), 22 S. W. Rep., 200; Hawkins v. Thomas, 29 N. E. Rep., 158; Chandler v. Rutherford, 101 Fed. Rep., 774.

Sheriff Brown could not and did not ratify any unlawful acts of his deputies. Joske v. Irvine, 91 Texas, 574; Dorr v. Mickley, 16 Minn., 20; Meacham Agency, sec. 114, 115; also sec. 18 and 19, chap. 2; Cooley on Torts, p. 127.

*W. T. Allen, R. E. Taylor* and *J. T. Montgomery,* for appellee.

CONNER, CHIEF JUSTICE.—This appeal is from a judgment in appellee's favor against the appellant, R. J. Brown, as sheriff of Clay County, and against W. H. Allen and Hugh Cozart, his deputies, for the sum of $2,000 as damages on account of gunshot wounds inflicted by said deputies during an attempt to arrest appellee for an alleged breach of the peace, and for an alleged violation of the law in unlawfully carrying a pistol in the Buffalo Springs community of Clay County during the night of the 23d day of December, 1904.

The vital question presented on this appeal is whether appellant, who was a nonparticipant, is liable for the acts of his deputies in so shooting and wounding appellee. In determining this question, we are required to review the testimony, which, so far as necessary, is substantially as follows: The evidence shows that upon the petition of a number of citizens living in the community of Buffalo Springs who were complaining of frequent disturbances and breaches of the peace by bad boys in that community, appellant appointed said Allen and Cozart deputy sheriffs, with instructions to suppress violations of the law and breaches of the peace in the community mentioned; that on the occasion of the injury Allen and Cozart, with the purpose of preventing disturbances, repaired to a point near Friendship Church, where a "box supper" was given on the night mentioned. Appellee was "drinking" and more or less boisterous during the supper, and thereafter he, together with Bruce Roberts, George Newman, R. Cozart, Lew Straley, and several other boys, mounted their horses and rode off in the direction of the point at which said deputies were located. There is evidence tending to show that soon after leaving the church some person in the crowd fired a pistol several times. Appellee, however, denied that he shot or that there was any shooting in the crowd.

He testified: "I did not have a pistol with me that night. I did not throw one away. I did not have one in my hand. I did not shoot one. I did not see anyone riding a gray horse fire a shot. I never seen nary a pistol fire. Did not hear any discharge or reports that sounded like pistol shots. Never heard anything but a firecracker. I taken it to be a firecracker. This is the only one I remember having heard fire that night until those shotguns were fired and I was injured." The evidence further shows that some of the boys were about fifty yards in front of appellee, but they had been halted by Allen and Cozart when he rode up. Hugh Cozart, upon whose testimony appellee principally relies to support the judgment against appellant, testified at this point as follows: "I heard them shooting. I saw the blaze. I don't know how many shots were fired. There must have been ten or twelve. I knew these shots were being fired along the road, near private residences. I knew this was a violation of the law. From the reports it was my opinion they were firing six-shooters. I taken it to be a six-shooter from the flash and the report. This shooting must have been two hundred, maybe two hundred and fifty, yards from me, along there somewhere. I could see the flash coming right straight from where the shooting was done to me. I could not see exactly this bunch of men coming all the way. They came right down the cliff or hill. I seen them coming towards me . . . Mr. Allen and I decided to stop them and search them for guns and arrest them for disturbing the peace. I had no ill will towards Bud King or Sank Wallis. We supposed that they were shooting. Q. You all decided to arrest them for disturbing the peace? And for carrying six-shooters? Is that what you decided to do, you and Mr. Allen, to stop them and search them for six-shooters? A. We supposed they were shooting there. Q. You were going to stop them and search them and arrest them for carrying six-shooters and disturbing the peace? A. Yes sir. We were going to get the six-shooters. Q. That was your purpose in stopping them then? A. Yes, sir, to get the six-shooters. . . . . We stopped those others (the boys in front), told them to line up, that we wanted to search them for pistols. . . . Frank Wright, Bruce Roberts, Everett Stultz, and Bud King got down off their horses, and we searched them. Sank Wallis was not there. He came up before we searched these boys. Bud King came down the hill directly after we stopped them and after Wallis. I didn't know who Bud King was as he was coming down. I had my back to King when he came up. The first I saw of him, Mr. Allen halloaed, 'Halt!' and I turned around. King was going by as hard as his horse could go. . . . I halloaed, 'Halt!' Then I fired at the horse to stop him. Mr. Allen fired at the horse to stop him. Mr. Allen fired his gun just a little before I did. I knew King was on the horse when I shot. It was moonshiny. I could see the gunsights. I didn't take as good aim as if it had been daylight, but I did take aim. I don't know which one of us hit this boy. At the time I shot I couldn't see what he was doing but running. I didn't know what he was doing. My idea was that he didn't want to be searched. I didn't see him have any pistol. I shot for the purpose of bringing his horse down and stopping him. I didn't care whether it killed his horse or not,

but I wanted to stop him. When I fired I suppose the horse was twenty, maybe thirty, steps away. Mr. Allen was a little further down the road than I was, a little closer to the horse." Cross-examined, this witness testified that "it is a fact that when Mr. Allen and I halted these people down there, our only purpose was to search them for pistols. When they came up firing them, we taken them to be pistols from the reports and flashes of them. My idea was to search them and get the pistols they were firing. My only purpose was to see if they had pistols. That was the only purpose I had. Just before King came down there Sank Wallis and Everett Stultz were advancing on Mr. Allen. It appeared to me from the acts of these parties as they were advancing on Mr. Allen that there was danger of a difficulty and danger to Mr. Allen. . . . After King passed through I heard five shots in the direction he had taken." On re-direct examination he was asked this question: "Were you trying to arrest them for violating the law?" His answer was: "I suppose you might take it that way. Q. That is what you took it to be—that you were trying to arrest them for violating the law? A. No, sir, I took it that I was trying to stop them for the purpose of searching them and getting the pistols from them. I know what it is to arrest a man. If they had had six-shooters I would not have turned them loose. I did turn loose everybody that we halted there. We did not find any six-shooters." The witness further testified that himself and Allen were still deputies and that at the time appellant appointed him "there had been a lot of disturbance—these boys shooting their six-shooters down there—and he (appellant) told me he would appoint me and wanted me to stop that. He didn't tell me how he wanted me to stop it. He said when there was any public gathering, anything like that around, for me to go and kinder see after it. I don't recollect whether he told me he wanted them arrested if they carried any six-shooters or not. As near as I can tell what he wanted me to do was to stop that disturbance. I don't think he told me how he wanted me to stop it. . . . He (appellant) made the same talk to both of us (the witness and Allen, the other deputy)." The witness further testified that the reason he and Allen went to the church that night was because they had been informed that the boys were drinking and that there would likely be trouble at the church where the box supper was to be had. Several witnesses testified to having heard firing, but after a careful search of the record we fail to find any witness who testifies that appellee, on the night in question, either had or fired a pistol, or that the deputy sheriffs recognized anyone at the time they saw the flashes and heard the reports. It is also undisputed that Allen and Cozart were not acting by virtue of any writ or process authorizing the arrest or detention of appellee or of any other person, and that appellant, Brown, was not present and did not learn of the occurrence until afterwards.

We have concluded that the acts of Allen and Cozart were not official in the sense necessary to cast upon appellant responsibility therefor. We had occasion to examine this question with some care in the case of Maddox v. Hudgeons (Texas Civ. App.), 72 S. W. Rep., 415, in which writ of error was refused by the Supreme Court, and the conclusion was reached that, in order to impose a responsibility upon a

sheriff for the act of his deputy, it must appear that the act of which complaint is made was done while in the execution of some writ or process lawfully issued, or while in the performance of some duty imposed by law upon the sheriff or the acting deputy. We think this conclusion is well established, not only by the case referred to and the authorities therein cited, but by many others that have been collated in appellant's brief in this cause. The good faith of the deputies whose acts are under consideration in this case does not seem to be questioned. We nevertheless feel impelled to the conclusion that their acts fall within that class of acts that are denominated by text-writers and in legal decisions as those done by "color of office." One of the definitions of these terms is: "A claim or assumption of right to do an act by virtue of an office, made by a person who is legally destitute of any such right." Black's Law Dictionary. It seems to us that the conduct of Cozart and Allen falls within the very terms of this definition. The case is not one of tort or wrong done in the execution of lawful process, or of wrongs committed while in the performance of duties enjoined by law. The Anglo-Saxon people have ever guarded with jealous care the person from all unreasonable seizures or searches, and our lawmakers have carefully defined the circumstances under which arrests may be made without warrant. Any person who shall, in this State, unlawfully carry on or about his person any pistol, under the circumstances set forth in chapter 4, tit. 9, of our Penal Code, may be arrested without warrant by any peace officer, and carried before the nearest justice of the peace for trial. Pen. Code 1895, art. 342. Indeed, this article declares that any peace officer who shall fail or refuse to arrest such person "on his own knowledge, or upon information from some credible person," shall be punished by fine not exceeding $500. Before, however, a duty under this article arises, or the power thus conferred can be exercised, it must at least appear that the fact constituting a violation of the law is within the personal knowledge of the officer attempting to arrest, or that some credible person shall have informed him of that fact. A most critical examination of the evidence in this case fails to show that appellee on the night in question had on his person at the box supper or along the road any pistol or other prohibited arm. It affirmatively shows that both Allen and Cozart were without personal knowledge of any such fact, had it been a fact, and that they acted without any information of that purport from any credible person.

Article 247, Code Cr. Pro. 1895, provides that "a peace officer or any other person may without warrant, arrest an offender when the offense is committed in his presence or within his view, if the offense is one classed as a felony, or as an offense against the public peace." Among the offenses classed as disturbances of the peace in chapter 3, tit. 9, of the Penal Code, is that of a person who rudely displays any pistol or other deadly weapon in or near any private house in a manner calculated to disturb the inhabitants of such house. It can not be affirmed from the evidence in this case, however, that appellee in his progress from the box supper displayed a weapon of any kind, or that any such offense by appellee was committed within the view of the deputy sheriffs. True, the evidence tends to show that some

one of the boys in the crowd may have done so, but the person, if any one, doing it was not within the view of the deputies. The flash witnessed by them conveyed the information that some person had offended, but we have found no provision of the law, and none has been cited, which would make it the duty of the deputies under such circumstances to arrest and search all those who were traveling the road at the time. Had appellee had on his person a pistol and the deputies had been so informed by some credible person, or had appellee in fact displayed a pistol in the manner detailed by some of the witnesses within the view of the officers who then shot, as they did, then, while the shooting was wholly unauthorized, appellant would doubtless be liable, as in such cases the act of shooting would amount to an abuse of an existing authority as contradistinguished from cases where wrongful acts are done pursuant to a mere assertion of authority. We think the case before us falls within the class of cases last mentioned, and we hence conclude, as before stated, that the acts of the deputies were not official and that appellant therefore is not officially responsible. Maddox v. Hudgeons (Texas Civ. App.), 72 S. W. Rep., 415; Hamilton v. Ward, 4 Texas, 356; Hughes v. Commonwealth (Ky.), 41 S. W. Rep., 294; Mechem on Public Officers, art. 797; Haley v. Greenwood, 28 Texas, 680; Thomas v. Browder, 33 Texas, 784; Heidenheimer v. Brent, 59 Texas, 533; Holliman v. Carroll's Admrs., 27 Texas, 23; Morris v. Kasling, 79 Texas, 148; Cortez v. State (Texas Cr. App.), 69 S. W. Rep., 536; Montgomery v. State (Texas Cr. App.), 65 S. W. Rep., 540, 55 L. R. A., 866; Russell v. State, 37 Texas Cr. Rep., 317; Alford v. State, 8 Texas Crim. App., 561; Lacy v. State, 7 Texas Crim. App., 413; Pickett v. State (Ga.), 25 S. E. Rep., 609; Williams v. State (Ga.), 28 S. E. Rep., 629; Grumon v. Raymond, 6 Am. Dec., 203; Barnes v. Whitaker, 45 Wis., 204, 19 Am. Rep., 751; State v. Wade, 40 Atl. Rep., 104; Gerbur v. Ackley, 37 Wis., 43; McLendon v. State (Tenn.), 22 S. W. Rep., 200; Hawkins v. Thomas (Ind. App.), 29 N. E. Rep., 158; Chandler v. Rutherford, 101 Fed. Rep., 774.

There is some suggestion in the record that appellant ratified the unlawful acts of his deputies, and is therefore liable upon this ground. While there is evidence to the effect that after the occurrence under consideration, appellant met said deputies and that, after hearing their rendition of the affair, replied in substance that he would have done as they did, we yet think the evidence wholly fails to establish a ratification of such character as to create a liability, if, indeed, a recovery herein could in any event be had on the ground of a ratification of acts so entirely unathorized.. See Door v. Mickley, 16 Minn., 20; Mechem on Agency, sec. 18, 114, and 115.

The deputies Allen and Cozart have not appealed and the judgment against them will therefore not be disturbed; but we think the judgment against appellant must be reversed, and here rendered in his favor, and it is so ordered.

*Reversed and rendered.*

Writ of error granted. Judgment of District Court affirmed.