MYERS et al. v. COLQUITT, Governor.
(No. 8048.)

(Court of Civil Appeals of Texas. Ft. Worth. Dec. 12, 1914. Rehearing Denied Jan. 16, 1915.)

1. OFFICERS ⬦131 — OFFICIAL BONDS — LIABILITY.

Bondsmen on official bonds are not liable for the acts of their principal or of his deputies when not performed within the scope of their official authority, but are liable for any abuse of the authority vested in the principal.

[Ed. Note.—For other cases, see Officers, Cent. Dig. §§ 229–234; Dec. Dig. ⬦131.]

2. CLERKS OF COURTS ⬦74—OFFICIAL BONDS —LIABILITY—"KEEP"—"OFFICIAL ACTS."

Under Const. art. 5, § 20, requiring the county clerk to act as clerk of the commissioners' court, and Rev. St. 1911, arts. 1747–1749, 1753, requiring the clerk to give bond conditioned on the discharge of his duties and authorizing the appointment of deputies, and requiring him to attend the commissioners' court and to keep the records, papers, and proceedings thereof, the issuance of warrants in payment of claims allowed by the commissioners' court, or the issuance of warrants without previous authority, is an "official act," for the word "keep" means, not only to preserve the manual possession of the records, books, and papers, but to correctly transcribe therein the proceedings of the court; otherwise he is guilty of a violation of his bond conditioned on his faithfully performing the duties required of him.

[Ed. Note.—For other cases, see Clerks of Courts, Cent. Dig. §§ 127–134; Dec. Dig. ⬦74.

For other definitions, see Words and Phrases, First and Second Series, Keep; Official Act.]

3. CLERKS OF COURTS ⬦74—OFFICIAL BONDS —MISCONDUCT OF DEPUTY—LIABILITY.

The act of a deputy county clerk in issuing fictitious warrants and selling them to third persons, who obtain from the county treasurer the money thereon, is misconduct within the official bond of the county clerk, and his sureties are liable therefor.

[Ed. Note.—For other cases, see Clerks of Courts, Cent. Dig. §§ 127–134; Dec. Dig. ⬦74.]

Appeal from District Court, Jones County; John B. Thomas, Judge.

Action by O. B. Colquitt, Governor, for the use and benefit of Jones County, against M. P. Myers and others. From a judgment for plaintiff, defendants appeal. Affirmed.

Walter S. Pope and Chapman & Coombes, all of Anson, and J. M. Wagstaff, of Abilene, for appellants. Higgins & Hamilton, of Snyder, Clint Chambers and Jas. P. Stinson, both of Anson, and B. F. Looney, of Austin, for appellee.

BUCK, J. This suit was filed in the district court of Jones county, Tex., against appellants by O. B. Colquitt, Governor of the state of Texas, for the use and benefit of Jones county, Tex. The petition alleged, among other things, that M. P. Myers was the duly elected county clerk of Jones county, Tex., for the years 1908 to 1910, and that the other defendants were sureties on his bond as county clerk; that said Myers duly qualified as such clerk; and that his bond was approved, and one J. E. Tyson was his duly appointed and acting deputy. The petition also alleged that, by virtue of his election as clerk and his acting as clerk, he was charged with the duty of keeping the minutes of the commissioners' court of Jones county and issuing warrants drawn upon the treasury of the said county. It further alleged that the said J. E. Tyson, as deputy clerk, issued a number of fictitious and forged county warrants upon printed forms used for issuing county warrants and sold the same to divers and sundry persons, who later presented them to the county treasurer, by whom said warrants were paid, and thereby the county was defrauded out of a large sum of money. It was further alleged: That it was a part of the duty of M. P. Myers, as clerk of the county court of Jones county, to be ex officio clerk of the commissioners' court, to attend its sessions, and to issue all notices, writs, and other processes of said court, and to keep the records, books, papers, and proceedings of said court, and to see that the same were properly indexed and arranged, and generally to do and perform such other duties as are, or may be, imposed on him by law as clerk of said court. That it became his duty to sign and attest under an official seal all warrants and script issued or ordered issued by the commissioners' court of Jones county against the treasury of said county, and to keep a correct record of accounts allowed by said court, the name of the person to whom allowed, the amount ordered to be paid thereon, the date on which it was allowed, the purpose for which the allowance was made, the fund on which the same should be drawn, and to issue script and warrants against the county treasury of Jones county signed by the clerk officially, dated and sealed, and to keep a correct record thereof either in the general minutes of the commissioners' court of Jones county, or in a book called "Minutes of Accounts Allowed," in which said accounts were kept by said M. P. Myers, as said ex officio clerk of the commissioners' court of

---

Jones county. It was further alleged in said petition that the county treasurer kept a record of accounts, warrants, and the registered indebtedness of the county, and at the end of each month he filed with the clerk of the county court a report in writing showing the amount of the claims registered during that month, and that it was the duty of the clerk of the county court with whom such report is filed to enter the same upon the finance ledger under the head of "Registered Indebtedness of the County," and to keep a separate account of each class of the indebtedness; that the treasurer of Jones county did this by filing his report with the principal, M. P. Myers; that these reports included the false, fraudulent, fictitious, and forged warrants, accounts, and script issued by J. E. Tyson as deputy county clerk aforesaid; and that Tyson knew that these reports included the false warrants, and that the entries on the finance ledger of the same were false, fraudulent, and fictitious and constituted a breach of the clerk's bond, in that there was a failure to keep the finance ledger which was a duty required of him by law. It was further alleged in said petition that, by reason of the issuing of these fraudulent warrants by the deputy county clerk, who was authorized by law to issue genuine warrants of the county, the primary cause of Jones county's loss is attributable to the breach of the county clerk's bond through his deputy, and that by reason of the failure of the clerk to keep the proper reports of all the proceedings of said court, and by reason of his failure to prevent the registration and payment of said warrants and script, which prevented the detection of the false and fraudulent character of the same, a secondary cause of the loss to Jones county was constituted; and that all of which facts as set out above constituted the proximate cause of Jones county's loss of the sum of $563.55, for all of which said defendants were liable.

Defendants answered by a general demurrer and general denial and special exceptions, and specially denied that said M. P. Myers and his deputy, J. E. Tyson, had any other powers than those conferred upon them by law, and denied that they, or either of them, had any authority or power to issue warrants of the character described until the accounts and claims had been duly allowed by the commissioners' court, and that, if said J. E. Tyson did issue any such warrants without such claims being duly allowed by the commissioners' court, he did so, not in his official capacity, but in a private and personal capacity and on his own responsibility, and that neither the defendant M. P. Myers, nor his bondsmen, were liable for any loss to Jones county resulting therefrom. And they further pleaded that even though said J. E. Tyson did issue the alleged forged and fictitious warrants, and that they were there-

after paid by the county treasurer of Jones county, the proximate cause of the loss to Jones county was the negligence of the county treasurer in paying said warrants, in the absence of any allowance by the commissioners' court, and that therefore the county treasurer was liable, and not these defendants.

The court overruled the general demurrer, and a trial was had, the cause being submitted to the jury, and a verdict was returned in favor of the plaintiff for the amount sued for. The defendants filed a motion for new trial, which was overruled, and, from said action of the court, perfected the appeal to this court.

Appellants complain, in the first assignment of error, of the action of the trial court in overruling defendants' general demurrer to the plaintiff's petition; and, in their second assignment, of the action of the trial court in refusing to give a peremptory instruction for the defendant M. P. Myers, and, in their third assignment, for the failure of the trial court to give a peremptory instruction in favor of the bondsmen—which three assignments we will consider together. The questions presented to us for consideration under these three assignments are: First, does the petition disclose a cause of action in favor of Jones county as against M. P. Myers; and, second, does said petition disclose a cause of action against the bondsmen of said M. P. Myers; and, third, does the evidence sustain the judgment against said M. P. Myers and his bondsmen?

[1] The appellants cite us, under their first assignment of error, to the following authorities: Maddox v. Hudgeons, 31 Tex. Civ. App. 291, 72 S. W. 415; Brown v. Wallis, 101 S. W. 1069, 1070; Sneed v. McFathridge, 43 Tex. Civ. App. 592, 97 S. W. 113; Gold v. Campbell, 54 Tex. Civ. App. 269, 117 S. W. 463; Whyte v. Mills, 64 Miss. 158, 8 South. 171; State v. Thomas, 88 Tenn. 491, 12 S. W. 1034. The first four cases cited are cases involving the liability of peace officers for the acts of their deputies and of bondsmen of such peace officers for the acts of their principal and his deputies. It is well established to be the law of this state by these authorities, and many others which might be cited, that bondsmen upon official bonds are not liable for the acts either of their principal or of his deputies when not performed within the scope of their official authority, but that they are liable for any abuse of the authority vested in such officials.

In the case of Maddox v. Hudgeons, above cited, a burglary having been committed in a distant part of Jack county, the sheriff (appellant in the case) left the following morning for the place of burglary. One Walter Isbell was the acting and qualified deputy sheriff, and soon after the sheriff's departure notified the constable of that pre-

cinct of the burglary and told him that the sheriff wanted him (the constable) to assist in arresting the parties committing the burglary. Soon thereafter on the same morning, said constable, without any direction on the part of Isbell, the deputy, and without any warrant or authority of law whatever, arrested one Hudgeons and another person in the town of Jacksboro on suspicion alone, and forthwith took them to the sheriff's office where said Isbell was. Isbell had received a description of the parties who were supposed to have committed the burglary, and the constable, after he arrived at the sheriff's office, inquired of Isbell if he should place appellee and the other party in jail. Isbell replied that he should, and thereupon the constable, without warrant or authority, took Hudgeons and the other party to the jail. The jailer being absent, the constable procured the keys from the jailer's wife and locked the alleged parties up in jail, where they remained some hours and where thereafter released by the jailer upon the order of Isbell. The court found that the jailer knew nothing of the imprisonment until noon of the day of said confinement, and he gave the imprisoned parties dinner, and thereafter released them as stated. Neither of these parties was in any way connected with the crime charged, and there was no reasonable ground for the suspicion upon which they were arrested, and that the sheriff, Maddox, had not directed Isbell to request the constable's assistance and knew nothing whatever of said arrest or imprisonment until after he returned to Jacksboro subsequent to the release of the parties. The court further found that it did not appear that the jailer was informed of the circumstances of the arrest or imprisonment, or that express demand for release was made of him by said Hudgeons on the jailer's return. Upon this statement of facts this court held, through Chief Justice Conner, as follows:

"We have been unable to avoid the conclusion that the judgment as against appellant is unauthorized by the facts. By title 101, Revised Statutes, relating to sheriffs and constables, authority is given sheriffs to appoint deputies, and by article 4897, sheriffs are made responsible for the 'official' acts of their deputies, and are given the same remedies against such deputies and their sureties as any person can have against the sheriff and his sureties. In the use of the term 'official' in this statute, when considered with its connecting clause, the Legislature must be presumed to have had knowledge of the well-defined distinction between official acts and acts done colore officii—a distinction upon which many of the apparently conflicting cases may perhaps be reconciled—and to have therefore intended to exclude responsibility for mere usurpation of authority on the part of their deputies. The deputy sheriff in question was in the performance of no duty imposed on him by law or by appellant in requesting McNeal's assistance. It is in case of resistance alone that authority is given to summon assistance, and no resistance or ground to so suspect is here shown. R. S. art. 4906, and Code Cr. Pr. art. 45. Isbell, then, in summoning McNeal's assistance, was in no sense acting in the performance of an official act or duty. Appellee's illegal arrest was not even directed by Isbell, and it would hence seem clear that appellant is not liable therefor. Nor was Isbell in the performance of official duty in directing McNeal to place appellee in jail. Isbell was without authority or color of authority, to direct McNeal to imprison, and such direction was no justification to McNeal in so doing. 'When a prisoner is committed to jail by lawful warrant from a magistrate or court, he shall be placed in jail by the sheriff.' Code Cr. Pr. art. 50. No warrant existed in the case before us, nor did there exist any of the grounds authorizing an arrest without warrant. * * * The Code makes it the specific duty of an officer making an arrest without warrant, when authorized, to take the accused 'immediately' before a magistrate, whose duty it is, after an examination, to make an 'order' committing the accused to jail of the proper county, when the law and facts so require, and to issue a warrant of commitment containing the requisites prescribed. The jailer did not receive appellee. He merely found him in jail, and it nowhere appears, as before stated, that he was apprised of the illegal arrest and imprisonment by the constable, or exercised any force to detain appellee. The entire performance seems to be, substantially, that of the constable, who acted without authority or color of authority, and it is difficult for us to see upon what distinction the sureties were released (of which appellee makes no complaint) and appellant held liable. It is entirely clear that if the action stated was official the sureties are liable. In speaking of the liability of the sureties, Mr. Murfree on Sheriffs, § 46, says that the liability is limited to the sheriff's 'official' acts. It is for the 'official' acts of his deputies that he is made liable under our statutes. So it has been held in this state that the sheriff, as such, is not liable for money collected after the return day of an execution. * * * In State v. McDonough, 9 Mo. App. 63, it was held that where an officer goes out of the line of his official duty, and unlawfully and without warrant makes an arrest, though done colore officii, the sureties on his bond 'for the faithful performance of his duties' are not liable."

In the case of Sneed v. McFathridge, above cited, a complaint against Sneed charging him with a misdemeanor had been filed by McFathridge, constable of Lamar county, with the justice of the peace of precinct No. 2 of said county, and a warrant for the arrest of said Sneed had been issued by said justice of the peace directed to the sheriff or any constable of Lamar county, which warrant said McFathridge sent to Anderson, the sheriff of Harris county, with a letter advising him where to find said Sneed, and directing and requesting him to arrest and detain said Sneed until he (McFathridge) could come for him. Upon the receipt of said warrant, Anderson, through one of his deputies, arrested said Sneed and placed him in custody in the city of Houston, a distance of about 20 miles from where he was arrested. Later McFathridge came to Houston and took Sneed handcuffed back to Lamar county, where he was later released on bond. Suit was filed against McFathridge and the sureties on his official bond and against A. R. Anderson, sheriff of Harris county, and the sureties on his official bond. In an opinion by Mr. Justice Talbot of the Fifth district, it was held that inasmuch as the statute required that when a warrant of arrest

was issued by a magistrate other than a judge of the Supreme Court, Court of Civil Appeals, district or county court, it cannot be executed in another county other than the one in which it is issued, unless indorsed by one of said judges, and, inasmuch as the evidence disclosed that the warrant in this case had not been so indorsed, that McFathridge and Anderson were liable for any injuries caused Sneed by means of said arrest and imprisonment, because there was no valid warrant for said arrest in Harris county, but that the bondsmen of Anderson were not liable, because the act of said Anderson in causing the arrest of said Sneed in Harris county without a valid warrant was not an official act for which his bondsmen could be held liable, and in this connection the opinion states:

"It is well settled that the liability of sureties on a sheriff's bond is limited to his official acts. In treating of this subject, Mr. Murfree, in his work on Sheriffs (section 46), says: 'They (the sureties) are responsible for the manner in which he performs, and for his omissions to perform, acts which it is his right and duty to perform by virtue of his office, virtute officii; but not for those in which his official character forms the pretense or color, not the authority.' "

In the case of Brown v. Wallis, cited above, on certified question from this court, the Supreme Court, in an opinion written by Chief Justice Brown, quoting from the opinion of this court as written by Justice Stephens, says:

" 'This is a companion case to that of Brown v. King, reported in [41 Tex. Civ. App. 588] 93 S. W. 1017, and [King v. Brown, 100 Tex. 109] 94 S. W. 328; but, while both suits arose out of the same unfortunate transaction, the trial of this case took a different course, and the issue is presented to us in a somewhat different form. In King v. Brown, the case was fully developed; but on the trial of this case no testimony was offered in behalf of appellant, and the substance of what was offered by appellee as to what transpired at the time he was injured is thus stated in his brief: 'The testimony of the appellee shows that he and a number of other persons on the night of December 23, 1904, went to a box supper at Friendship Church in Clay county, Tex., and that, after the congregation was dismissed, he and a number of other persons started down the road south from the church house, and that immediately after leaving the church, and while going south to the place where he was shot and injured, some of these parties near whom he was riding where discharging pistols, or firearms of some kind that sounded like pistols; that they were traveling along a public road and passed at least two private residences near the road before they reached the place of the difficulty; that after they had gone about a mile down the road, the defendants, Cozart and Allen, commanded the appellee and those with whom he was traveling to halt, and commenced searching them for pistols; that the defendant Allen told the appellee and the other parties that that shooting had to stop, that it had gone far enough, and that they were going to stop it; that the defendant Cozart told appellee to get down off of his horse and be searched; and that appellee refused to alight from his horse and told Cozart he could search him without his getting off his horse; that the defendant then told the appellee that he must get down off of the horse and be searched, that that was the law, and, upon the appellee refusing to do so, Cozart struck the appellee with his gun. Appellee's horse whirled, and appellee started to run, and Cozart then shot him in the back with a shotgun after he had run about 20 steps.' "

In holding the sheriff, R. J. Brown, not liable for the acts of his deputy, as above set forth, the opinion says:

"This court will confine itself to the facts certified in the statement accompanying the question, and, looking to that statement, we find that the evidence does not prove at what point the firing of the pistol or pistols occurred. It does not appear that it was within the hearing or within sight of Cozart and Allen, or that they were able to discern the persons who did the firing, or the young men who were acting together. * * * The facts in this case are very different from those presented to us in the case of King v. Brown [100 Tex. 109] 94 S. W. 328."

In the latter case referred to, a companion case to the one just quoted, the court found as matter of fact that the shooting took place within the presence of the deputies, and that said deputies were acting within the scope of their official authority in making such arrest, under such circumstances, and that their principal, the sheriff, was responsible, as also his bondsmen, for any injuries inflicted while in the performance of said act or arrest, even though it should be developed that the person arrested had not in fact been guilty of the shooting for which the arrest was made, and in this latter case Mr. Justice Brown says, quoting from article 247 of the Code of Cr. Pro. 1895:

"A peace officer or any other person may, without warrant, arrest an offender when the offense is committed in his presence or within his view, if the offense is one classed as a felony, or as an 'offense against the public peace.' The deputies, Cozart and Allen, were peace officers, and the act of firing the pistols on a public road near to a private residence constituted an 'offense classed as against the public peace.' * * * At the time the pistols were fired, the body of men in the public road, where the flashes were seen and reports heard by the officers, were within 200 or 250 yards of the officers who saw the men at the time the shots were fired. The offense was committed in the presence of the two officers."

From this opinion, it will be seen that the official character of an act is not determined by its lawfulness, or by the existence of good faith vel non on the part of the officer performing the act. It was admitted that Allen and Cozart were regularly appointed deputies of the sheriff; that under the law they were authorized to arrest persons who had committed an offense against the public peace in their presence or in the presence of said officers; that an offense against the public peace had been committed by some person or persons and in the presence and view of said officers; but in making the arrest they seemed to have made a mistake in concluding that the man who was shot had been guilty of such offense.

"Allen and Cozart purported to act as deputy sheriffs and not in their personal character, and, thus assuming to exercise their official authority, it devolved upon them to determine from the facts presented whether the offense of firing the pistols on a public highway near to a residence

had been committed, and also to decide whether King was guilty of the offense. In making this decision they acted in their official capacity, and the attempt to arrest King was an official act for which his principal, R. J. Brown, is responsible. * * * If Allen and Cozart had been acting under a regular warrant authorizing them to arrest a man named Jones, charged with the commission of the same offense, it would have devolved upon them to determine whether or not King was the person named in the writ, and if they had made a mistake, as they did in this case, and, upon King fleeing, had shot him, as they did, the fact that the writ did not authorize him to arrest King would not change the character of the attempted arrest from an official to nonofficial [act]. As stated in a number of cases cited above, such a doctrine would result in no responsibility; for, if the act be lawful and lawfully performed, there can be no responsibility whatever, because no damage would result from such an act."

[2, 3] The question presented to us for determination is: Were the acts of J. E. Tyson, in manufacturing and issuing these fraudulent and fictitious warrants, official acts for which his principal, and the latter's bondsmen, would be liable? From a rather careful and extensive examination of the authorities cited us in the briefs of both the appellants and the appellee, and from independent investigation, we are convinced that said question should be answered in the affirmative. The condition of the bond was that:

Said "M. P. Myers, as county clerk of Jones county should faithfully perform and discharge all the duties required of him by law as county clerk aforesaid, and shall safely keep the records of his office."

It was the duty of the county clerk to act as clerk of the commissioners' court. Section 20, art. 5, State Constitution, and article 1753, Revised Statutes 1911. And it was his duty as such clerk of the commissioners' court to "attend upon each term of said court, to issue all warrants, writs and other process required by said court, to keep the records, books, papers and proceedings of said court, and see that the same are properly indexed, arranged, and preserved, and generally to do and perform such other duties as are, or may be imposed on them by law as clerk of such court." He was required as such county clerk to give a bond conditioned as the bond set out in plaintiff's petition, and was authorized to appoint one or more deputies by written appointment under his hand and seal of court, thereby vesting in said deputies the right to do and perform all the official acts which he as county clerk might do and perform. Articles 1747, 1748, 1749, Revised Statutes 1911; and, also, Frizzell v. Johnson, 30 Tex. 32; Rose v. Newman, 26 Tex. 131, 80 Am. Dec. 646; Wimbish v. Wofford, 33 Tex. 110; Harrison v. Harwood, 31 Tex. 651–656. Since the state Constitution provides that the county clerk shall be clerk of the commissioners' court, we think it unquestionably true that a bond as county clerk would cover any official acts performed as clerk of the commissioners' court. And since it was his duty as said clerk of the

commissioners' court "to keep the records, books, papers and proceedings of said court, and see that the same are properly indexed, arranged and preserved," we hold that he was performing an official act in issuing the warrants in payment of the claims allowed by the commissioners' court. And that the expression to "keep" means, not only to preserve the manual possession of said records, books, papers, etc., but to correctly transcribe in such records, books, papers, etc., the proceedings of said court, and that if he should fail to so correctly transcribe and keep such records, books, papers, and proceedings of said court, he would be guilty of a violation of the terms of the bond sued on "faithfully (to) perform and discharge all of the duties required of him by the law as county clerk aforesaid" and to "safely keep the records of his office." If claims had been allowed by the commissioners' court and the clerk had issued warrants for a larger amount than had been allowed, or to persons as payees different from those to whom such claims had been allowed, unquestionably he would have violated the terms quoted of the bond aforesaid, and it occurs to us that the acts are none the less "official acts" because he issued such warrants without any previous authority of the commissioners' court.

In support of this construction of the meaning, force and effect of the terms of this bond, we are cited by appellee to the following cases: Coe v. Nash, 40 S. W. 236; State v. Nevin, 19 Nev. 162, 7 Pac. 650, 3 Am. St. Rep. 873; Hart v. U. S., 95 U. S. 316, 24 L. Ed. 479; Silver Bow County v. Davies, 40 Mont. 418, 107 Pac. 81; Jackson County v. Derrick, 117 Ala. 348, 23 South. 193; County of Waseca v. Sheehan, 42 Minn. 57, 43 N. W. 690, 5 L. R. A. 795; Campbell v. People, 154 Ill. 595, 39 N. E. 578; Spindler v. People, 154 Ill. 637, 39 N. E. 580; People v. Treadway, 17 Mich. 481; Mahaska County v. Ruan, 45 Iowa, 328; Marlar v. Tishomingo, 62 Miss. 677; Cricket v. State, 18 Ohio St. 9. In practically all of these cases the principle of law is laid down that the government is not bound by the negligence of its officers, nor estopped from asserting its right to recover on official bonds of officers because other officials of the government had been guilty of negligence of malfeasance, misfeasance, or nonfeasance, which acts may have contributed to and conduced to cause the loss sustained.

In the case of State v. Nevin, above cited, it is held:

"Public officers who are intrusted with public funds, and required to give bonds for the faithful discharge of their official duties, are not mere bailees of the money, to be exonerated by the exercise of ordinary care and diligence. Their liability is fixed by their bonds; and the fact that money is stolen from them, without any fault or negligence upon their part, does not release them from liability thereon." And that "the bond requiring faithful performance of official duty is as binding upon the principal and his sureties as if all the statutory duties of the officer were inserted in it."

In Mahaska County v. Ruan, above cited, it was held:

"The sureties upon the bond of a county auditor are liable for any overdrafts he may have made by issuing warrants payable to himself and receiving from the treasurer the amount thereof, in excess of the compensation allowed him by the board of supervisors."

In this case, in reply to the contention of the appellants that as sureties on the bond of said auditor they were not liable for such overdraft, because the money was not received by Ruan by virtue of his office, the court held that they were so bound because Ruan was authorized by law to sign orders, and the fact that in the instance complained of he had signed orders for amounts in excess of what he was allowed by law did not in any way affect the question of the responsibility of the sureties.

In the case of Spindler v. People, the court held:

"The sureties on the official bond of a county clerk are liable for money received by him from the county treasury upon unauthorized county orders issued by him, payable to himself, since the fact that they were so payable does not change the issuing of them from an official to a private act."

In the case of Cricket v. State, 18 Ohio St. 9, above cited, the condition of the bond was as follows:

"Now, if the said Wm. D. Cricket shall well and truly and faithfully discharge the duties of his said office, as such auditor, then this obligation to be void, etc."

The statutes of Ohio provided that the compensation of the auditor was to be paid out "of the county treasury on the order of the county commissioners"; and it was urged on behalf of the sureties on said bond that inasmuch as no such order existed or had ever been given for the payment of the amount collected in excess of the auditor's salary, which was the loss complained of in the suit, the act of the auditor in drawing the warrant for such excess amount was not an official act, and that therefore the sureties were not liable. In overruling this bill of exceptions the court said:

"The money was obtained on the auditor's own warrant drawn as auditor, and which he was not authorized by law to draw or use for such purpose. The warrant purported to be an official act; it was drawn under color of office, and constituted the means by which the money was obtained from the treasury. If no more money had been obtained than was due the auditor, though there would have been a misfeasance in the mode of obtaining it, there would have been no substantial injury. But, to the extent the money obtained exceeded the amount due, there was substantial injury, for which the bond, in our opinion, afforded a remedy.'

In the case of Hart v. U. S., 95 U. S. 316, 24 L. Ed. 479, the court holds:

"The government is not responsible for the laches or the wrongful acts of its officers. * * * Every surety upon an official bond to the government is presumed to enter into his contract with a full knowledge of this principle of law, and to consent to be dealt with accordingly. The government enters into no contract with him that its officers shall perform their duties."

The Supreme Court of Illinois, in the case of People v. Bartels, 138 Ill. 322, 27 N. E. 1091, held, that the sureties on a bond given under the probate act providing that the clerk of the probate court shall give a bond "for the faithful performance of the duties of his office," that "a probate clerk who makes false certificate to an acknowledgment violates the conditions of his bond and his sureties are liable." Said statute further provided that the probate clerk had authority to take acknowledgments to deeds and other instruments.

The case of Silver Bow County v. Davies, 40 Mont. 418, 107 Pac. 81, it seems to us, is at least persuasive. This was an action to recover on the official bond of Davies given as clerk of the district court of Silver Bow county. Certain sums of money were alleged to have been lost to the county through the wrongful acts of the deputy of Davies, one W. P. Farrell. It was admitted that Farrell had issued fraudulent and fictitious certificates which purported to be on their face juror and witness certificates to the amount alleged in the complaint. It was averred, however, that they were of no apparent validity, because they were not issued under the seal of the court, as required by law; that in issuing them Farrell acted as an individual and not as deputy clerk. It was also averred that payment of these certificates by the treasurer was made in violation of law, as is alleged in the answer of appellants, defendants below, in the case at bar, because he was prohibited by law from disbursing the funds of the county upon them. It was further alleged by the defendants in the trial court, because the acts of Farrell in making and issuing these certificates were not acts for which he could be held criminally liable under the law, in that Farrell had omitted to impress upon them the seal of the court, therefore said instruments had no apparent legal validity, and that their false or fraudulent making did not constitute forgery, that the bondsmen were not liable for any loss thereby sustained to the county. In this connection the court says:

"The liability of defendants in this case is not in our opinion to be determined by the fact that, in manufacturing and issuing the certificates, Farrell was not technically guilty of the crime of forgery. Their liability turns upon an answer to the question: Did the issuance of the certificates, in the form in which they were issued, and under color of office, operate as an effective cause of loss to the county? Under the statute, the condition of every official bond must be that the principal shall faithfully perform the official duties required of him by law as it exists at the time he enters upon his office, as well as those imposed by law subsequently enacted. The principal and sureties upon any official bond are also in all cases liable for the neglect, default, or misconduct in office of any deputy, clerk or employé, appointed or employed by such principal. (Citing the section of the Montana Code.) By this latter provision the illegal act or official misconduct of the deputy is expressly put in the same category as the illegal act or misconduct of the principal. Therefore, while no liability could

attach for any official act, whether illegal or not, which has not resulted in injury, the contract of the surety includes indemnity against loss or injury to the county or others caused by the wrongful acts of either. It was among the powers and duties of Davies and his deputies to issue certificates to the persons who had served as jurors and witnesses. Any abuse of this power resulting in loss was a lapse in the performance of duty, against which the surety agreed to indemnify the county."

It may be urged that in the case just quoted the acts of the deputy clerk out of which the loss was sustained were acts that he had authority to perform, without any previous action on the part of the commissioners' court with reference thereto, and that the term "misconduct" is not included in the terms of the bond sued upon in the case at bar. As to the first difference noted, we think there would be no distinction in law as to the liability of the bondsmen. The clerk, in the case quoted, had no authority under the law to issue those juror and witness certificates, except after the performance of the service and to those performing the same as indicated in such certificates, and if, in the absence of the performance of such services, he issued such certificates, or issued the same to persons who had not performed such services, he would be guilty, it seems to us, of an act of misconduct coming no more strongly within the purview of an official duty than if the certificates had been issued in payment of, or purporting to be in payment of, claims which in the due course of the county's business should have been allowed by the commissioners' court, but which were not so allowed. Article 1459, Rev. Civ. Stat. 1911, provides, in part:

"All warrants or scrip issued against the county treasurer by any judge or court shall be signed and attested by the clerk or judge of the court issuing the same, under his official seal."

Therefore Tyson, in signing and attesting such warrants, was doing an official act, specially imposed by statute, and thus, in a measure at least, he gave currency to the fictitious warrants issued. It would seem that the term "misconduct," with respect to which it is claimed that the bond in the Montana case just quoted, imposes upon the bondsmen an additional burden to those imposed by the bond in the case at bar, could only mean "official misconduct," and it was so construed in that case. But as to this we are not called upon to decide, in view of the fact that the article of the statute quoted above constitutes the act of signing and attesting such warrants an official duty.

In the case of Lewis v. State, 65 Miss. 468, 4 South. 429, the Supreme Court says:

"It was among the powers and duties of Bracey as circuit clerk to issue, under certain conditions, certificates to witnesses, to be paid by the county; and if, in exercising this power or performing this duty, he acted wrongfully or violated his duty in any respect, so that the county, whose agent and servant he was in the matter, was thereby defrauded, it was a breach of his bond. There is much refinement and quibbling in the books in behalf of sureties on official bonds who are sought to be held responsible for the misconduct of their principal, as to whether the act of the officer was done colore officii or virtute officii, or whether it constitutes a misfeasance, or a nonfeasance. While the liability of sureties is not to be extended beyond the terms of their engagement, the public is entitled to some consideration, as well as the voluntary sponsors of unfaithful public officers; and it must be true that, if an officer, under bond to faithfully discharge the duties of his office, does an act as such officer, injurious to the county or to others, in regard to a subject over which he has jurisdiction and control, his sureties cannot escape responsibility for the act, no matter by what technical name it may be called."

Further quoting from the case of Silver Bow County v. Davies, the court says:

"But counsel for the defendants argue that in going forward, in the line of causation from the misuse of his official position by Farrell until the loss is reached, the first efficient proximate cause encountered is the unauthorized payment of the certificates by the treasurer, and hence that the treasurer alone, and not the clerk, is liable. * * * When we look for the direct and proximate cause of the loss suffered by plaintiff, no just conclusion can be reached other than that the deputy's conduct was, to say the least, one of the proximate causes of the loss, and not a mere condition. To be sure, the treasurer was guilty of gross negligence, without which the loss would not have occurred; but this did not excuse the clerk. If the certificates had been under seal and fair on the face, but forged by the clerk himself or one of his deputies, there could be no question as to the liability of the clerk and his sureties. Are they any less liable because the deputy adopted a different expedient, as he did in this case, and thus avoided criminal liability? The negligence of the treasurer and the misconduct of Farrell operated as concurrent causes. The principle applicable is that, where two causes operate concurrently to produce an injury, both are to be deemed direct proximate causes, and liability attaches to all persons who had to do with putting either of the causes in motion."

Appellant relies on the case of Whyte v. Mills, 64 Miss. 158, 8 South. 171, in which it was held by the Supreme Court of Mississippi that:

"Though the clerk of a board of supervisors gives his deputy entire charge of his office, he is not liable to the purchasers of county warrants fraudulently issued by the deputy; who used for that purpose the blanks furnished by the county, signing thereto the names of the clerk and the president of the board, and attaching the clerk's official seal."

That this case is not in point, nor is expressive of the law in the Mississippi jurisdiction pertaining to a state of facts as found in the case at bar, is shown by the case of Lewis v. State, 65 Miss. 468, 4 South. 429, in which the court held that the sureties on a clerk's bond conditioned "that he shall faithfully perform the duties of his office" are liable to the county for any injury resulting to it from the issuance by such clerk of false and fraudulent witness certificates; it being his duty to issue witness certificates as provided by law. And in this latter opinion the court further says:

"Whyte v. Mills, 64 Miss. 158, 8 South. 171, relied on by appellants, cannot affect the case at bar. That was not a suit in which a county was complaining of a violation of official duty by one of its officers, but the plaintiff was a

party who had purchased false and fraudulent county warrants after they had been issued and put into circulation by a deputy chancery clerk, and it was sought to hold the chancery clerk liable for the willful and unauthorized act of his deputy. The question of the liability of the clerk and the sureties on his official bond, for the violation of an official duty resulting in injury to the county, was not involved in the case."

While it is not necessary for us to determine in this opinion whether or not the liability of the appellants would be different or changed if the plaintiff in the court below was a purchaser of one of these fraudulent certificates alleged to have been issued by Tyson, it is evident that the case relied on by appellants from the Mississippi Supreme Court does not sustain their contention.

From a rather full consideration of the authorities, we are led to believe that the trial court did not err in refusing appellants' general demurrer and in refusing special charges Nos. 1 and 2, and therefore appellants' first, second, and third assignments of error are overruled.

In the fourth assignment appellants complain that the verdict of the jury and the judgment of the court entered thereon is contrary to the law and evidence, in that the undisputed evidence shows that the warrants were not presented to the treasurer of Jones county by J. E. Tyson for payment; that the said J. E. Tyson, after he put said warrants into circulation, sold them to other persons than himself, and they were paid to such other persons by the county treasurer of Jones county. We do not think there is any merit in this assignment, for J. E. Tyson, in issuing said fraudulent warrants and putting them in circulation, put in motion the means and force which finally resulted in the loss to Jones county and was the inducing cause of such injury to the county, and therefore said assignment is overruled.

In their fifth assignment, the appellants complain that the verdict of the jury and the judgment of the court rendered thereon is contrary to the law and evidence as against the sureties on the bond for the reason that the undisputed facts show that the warrants were paid to other and different persons than J. E. Tyson long after the expiration of the term of office of said Myers as county clerk. For the reasons given in overruling the fourth assignment, we likewise overrule the fifth assignment of error.

Finding no error in the judgment of the trial court, it is in all things affirmed.